UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **BRIAN BONNER,** )<br>)<br>    **Plaintiff,** )<br>)<br>v.  )<br>)<br>**NORINCO a/k/a** )<br>**CHINA NORTH INDUSTRIES CORP.** )<br>**et al.,** )<br>)<br>    **Defendants.** ) | Case No.: 3:06-cv-00715-MHT |

**BRIEF IN SUPPORT OF
DEFENDANT CHINA NORTH INDUSTRIES CORPORATION'S
MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

On November 15, 2003, the Plaintiff, Brian Bonner, severely injured his right hand while handling a loaded and cocked shotgun with the gun's safety disengaged. It is unclear exactly how the incident occurred—Plaintiff, the only person in a position to know how the incident occurred, testified that he does not remember what happened. What is clear is that Plaintiff, who was right-handed, somehow engaged the trigger of the subject shotgun while he had his right hand over the muzzle of the loaded, cocked gun. There is no evidence to support Plaintiff's claim that an alleged defect in the shotgun caused his injury. Instead, the evidence demonstrates that it was Plaintiff's own negligence that proximately caused Plaintiff's injury. Accordingly, China North Industries Corporation ("Norinco") is entitled to summary judgment as a matter of law.

II.   **STATEMENT OF FACTS**

Plaintiff has been taught how to handle firearms since he was only four years old. (O. Knowles Dep., p. 11, lines 12-20.) Starting at the age of four, Plaintiff's mother would take him to shoot guns and familiarize him with gun safety at least once every year. (O. Knowles Dep., p. 13, lines 1-15.) She showed him how the safety worked, taught him not to point the gun at anyone or anything unless he intended to shoot it, and taught him to treat guns as if they were loaded. (O. Knowles Dep., p. 13, lines 1-15.) Plaintiff's step-father also taught Plaintiff about gun safety. (J. Knowles Dep., p. 8, lines 10-18.) When asked about rules of gun safety, Plaintiff testified that you should not cock a gun until you are ready to shoot, that you should always keep the safety engaged, and that you should never have it aimed at anybody or anything unless you intend to shoot it. (B. Bonner Dep., p. 26, lines 11-20.) He also testified that if the gun fails to fire you should get someone that knows about guns to inspect it. (B. Bonner Dep., p. 27, lines 21-23.)

From a young age, Plaintiff had used and was familiar with a variety of firearms, including 12-gauge shotguns. (B. Bonner Dep., p. 18, lines 8-18.) He liked shotguns and wanted to buy one. (B. Bonner Dep., p. 34, lines 13-16.) Plaintiff found the shotgun that is the subject of this action at Pawn City, a pawn shop in Lanett, Alabama. (B. Bonner Dep., p. 30, lines 14-23; p. 31, lines 1-23.) The subject shotgun is a Norinco Model 98, 12-gauge, 18-inch barrel, pump shotgun, serial number 0016971. (Report of John T. Butters, p. 1, lines 2-3.) Norinco did not manufacture the subject shotgun. (Motion for Leave to File Plaintiff's Second Amended Complaint (Doc. #40), ¶ 5.) The shotgun was sold to Norinco in July 1999. (Norinco's Response to Plaintiff's Interrogatories, ¶ 2.)

2

Norinco exported the shotgun to the United States through Interstate Arms, the importer, in November 1999. *Id.* Interstate Arms sold the shotgun to Langley Gun Shop in Valley, Alabama, on May 24, 2001. (Interstate Arms' Response to Plaintiff's Interrogatories, ¶ 2.) The shotgun was eventually sold to Pawn City, but the identity of the owner (or owners) of the shotgun between Langley Gun Shop and Pawn City is unknown. (O. Knowles Dep., p. 10, lines 20-22); (B. Bonner Dep., p. 108, lines 21-23).

Plaintiff's mother purchased the shotgun on November 5, 2003, after the Plaintiff had picked it out a few days earlier with a friend. (B. Bonner Dep., p. 30, lines 14-22; p. 44, lines 12-16.) Plaintiff's mother tried to talk him out of purchasing the gun because it was used and she does not like used items, but Plaintiff insisted. (O. Knowles Dep., p. 10, lines 13-19.) Plaintiff gave his mother the money for the shotgun and she purchased it for him because he was not old enough to purchase the gun himself. (B. Bonner Dep., p. 42, lines 13-19.)

Plaintiff first fired the gun the day after he bought it, and he estimated that he fired it on three or four occasions before the day of his injury. (B. Bonner Dep., p. 44, lines 17-23; p. 46, lines 5-7; p. 48, lines 1-10; p. 50, lines 11-15; p. 51, lines 3-8.) The Plaintiff testified that he did not have any problems with the shotgun prior to November 15, 2003, the day of his injury. (B. Bonner Dep., p. 50, lines 3-5, 16-19.)

On November 15, 2003, Plaintiff was at his aunt's house shooting guns with his cousin, Jason Stewart, and his friend, B.J. Sadler. (B. Bonner Dep., p. 61, lines 4-23.) At the time of the incident, Plaintiff and B.J. Sadler were the only ones shooting guns. (B. Bonner Dep., p. 68, lines 11-23.) Plaintiff and B.J. were target shooting with three guns—a rifle, a 20-gauge shotgun, and the subject shotgun—in a field across the street

3

from Plaintiff's aunt's house. (B. Bonner Dep., p. 61, lines 17-19; p. 62, lines 11-15); (B. Dennis Dep., p. 16, lines 17-23).

Plaintiff testified that he and B.J. Sadler were the only ones that fired the subject shotgun that day. (B. Bonner Dep., p. 66, lines 3-7.) Plaintiff testified that he fired it first, shooting it four or five times—enough to empty the magazine, which Plaintiff testified holds four or five shells. (B. Bonner Dep., 66, lines 8-23; p. 67, lines 1-5; p. 54, lines 12-15.) Then B.J. fired the gun two to four times. (B. Bonner Dep., p. 69, lines 1-5.) Up to this point, Plaintiff and B.J. had not had any problems with the shotgun. (B. Bonner Dep., p. 66, lines 17-20; p. 67, lines 1-13.) Bobbie Dennis, Plaintiff's aunt, testified that she checked on the boys shortly before Plaintiff's injury occurred, and that they did not indicate they were having any problems with the shotgun. (B. Dennis Dep., p. 17, lines 12-13; p. 18, lines 3-5.)

B.J. tried to fire the shotgun again, but when he pulled the trigger it just clicked—the gun did not discharge. (B. Bonner Dep., p. 72, lines 10-21.) At his deposition, Plaintiff referred to the gun's failure to fire as a "misfire." *Id*. Plaintiff told other people that the gun had "jammed." (C. Dennis Dep., p. 59, lines 1-5); (T. Knowles Dep., p. 18, lines 5-21). Plaintiff testified that he and B.J. heard a metal sound, like something popped, just prior to the "misfire." (B. Bonner Dep., 70, lines 19-21; p. 72, lines 1-4.) He testified, however, that they did not really pay attention to the metal sound. (B. Bonner Dep., p. 70, lines 19-21.)

After the gun "misfired" or "jammed," B.J. handed the shotgun to Plaintiff. (B. Bonner Dep., p. 72, lines 10-23.) Plaintiff then asked B.J. to go get Plaintiff's uncle so that he could look at the gun, and B.J. started walking toward the house. (B. Bonner

4

Dep., p. 77, lines 1-5; p. 78, lines 18-23; p. 79, lines 1-4.) Plaintiff testified that he does not remember what happened next, but he told his uncle that he was trying to "unjam" the gun. (B. Bonner Dep., p. 62, lines 1-10); (C. Dennis Dep., 59, lines 1-5). Plaintiff's step-grandfather testified that Plaintiff told him that he had the gun standing up with his right hand over the muzzle. (T. Knowles Dep., p. 18, lines 5-21.) Plaintiff is right-handed and would normally pull the trigger with his right hand. (B. Bonner Dep., p. 22, line 23; p. 23, lines 1-6); (B. Dennis Dep., p. 52, lines 14-23).

At that point the gun discharged, shooting a hole through Plaintiff's right hand. (B. Bonner Dep., p. 80, lines 16-21; p. 76, lines 8-9.) At the time of Plaintiff's injury, the gun was loaded and cocked with the safety disengaged and the barrel in place. (Report of John T. Butters, p. 2, lines 17-22.) Plaintiff's expert concluded that the trigger must have been engaged for the gun to discharge. (Report of John T. Butters, p. 2, lines 7-28.)

Because B.J. had already started walking toward the house when Plaintiff's injury occurred, his back was turned and he did not see what happened. (B. Bonner Dep., p. 80, lines 7-9, 16-18.) Bobbie Dennis, who was outside raking and burning leaves, heard the gunshot and heard screaming, but she did not see what happened either. (B. Dennis Dep., p. 15, lines 13-19; p. 17, lines 2-11.) Plaintiff was the only person in a position to know how the incident occurred. (B. Bonner Dep., p. 68, lines 22-23; p. 80, lines 16-18.)

As Plaintiff ran toward the house, Bobbie Dennis took off her shirt and wrapped it around Plaintiff's hand. (B. Bonner Dep., p. 81, lines 1-15); (B. Dennis Dep., p. 27, lines 12-20). B.J. ran to the house ahead of Plaintiff and Mrs. Dennis, to get Jim Knowles and Ralph Stewart, who were inside watching a football game. (B. Bonner Dep., p. 81, lines 15-28); (B. Dennis, p. 25, lines 2-14). Mr. Knowles and Mr. Stewart took Plaintiff to the

5

hospital in Mr. Stewart's truck. (B. Dennis Dep., p. 33, lines 5-15.) Mrs. Dennis and B.J. followed behind. (B. Dennis Dep., p. 33, lines 16-19.) Several other family members, including Plaintiff's uncle, Chris Dennis, met them at the hospital. (C. Dennis Dep., p. 15, lines 11-18.)

At the hospital, Chris Dennis volunteered to go back to the field where the accident occurred to retrieve the guns. (C. Dennis Dep., p. 16, lines 22-23; p. 17, lines 1-6.) Mr. Dennis took B.J. with him so that he could find the guns. (C. Dennis Dep., p. 29, lines 14-15; p. 31, lines 5-8.) The subject shotgun was in one piece and was laying on a dirt trail when Mr. Dennis found it. (C. Dennis Dep., p. 36, lines 14-23; p. 18, lines 3-4.) Mr. Dennis picked up the shotgun, put it behind the driver's seat of his pickup truck, and then drove to his house. (C. Dennis Dep., p. 18, lines 15-22.) After he arrived at his house, Mr. Dennis took the shotgun out of his truck to take it into his house and put it in his gun safe. (C. Dennis Dep., 19, lines 9-23; p. 20, lines 1-10.) He was holding the shotgun in his left hand so that the stock of the gun was under his left arm and the barrel was pointed toward the floor. (C. Dennis Dep., p. 50, lines 14-23; p. 51, lines 1-15.) He had walked up the stairs to his back door and had just started to open the door when the barrel fell off of the shotgun. (C. Dennis Dep., p. 48, lines 11-23; p. 49, line 1; p. 51, lines 12-23; p. 52, lines 1-4.) Mr. Dennis picked up the barrel, put it back on the shotgun, and put the shotgun in his gun safe. (C. Dennis Dep., p. 52, lines 5-23.) Mr. Dennis did not notice anything wrong with the shotgun until the barrel fell off on his porch. (C. Dennis Dep., p. 18, lines 7-11; p. 20, lines 11-15.)

Based on Mr. Dennis's account of the barrel falling off of the shotgun, Plaintiff speculated that the barrel may have come off of the shotgun at the time of his injury. (B.

6

Bonner Dep., p. 88, lines 7-23; p. 89, lines 1-3.) Plaintiff acknowledged, however, that he does not know whether that actually happened. (B. Bonner Dep., p. 110, lines 14-16.)

On January 6, 2005, Plaintiff filed this action in the Circuit Court of Chambers County, Alabama. (Complaint.) Each of the claims set forth in Plaintiff's Complaint is based on the allegation that the subject shotgun was defective and that it "fell apart and unexpectedly fired into and through [Plaintiff's] hand causing him severe and permanent injury." (Complaint ¶ 7.) Plaintiff's expert's opinion on causation is likewise based on the notion that the shotgun fell apart—more specifically, that the barrel started to fall off of the gun—at the time of Plaintiff's injury. (Report of John T. Butters, p. 1, lines 2-7.) Plaintiff, the only person in a position to see how the accident occurred, testified that he does not know whether the barrel of the shotgun started to fall off the gun at the time of his injury. (B. Bonner Dep., p. 68, lines 22-23; p. 80, lines 16-18; p. 88, lines 7-23; p. 89, lines 1-3; p. 110, lines 14-16.)

Norinco was served with Plaintiff's Complaint on or about June 19, 2006. (Notice of Removal (Doc. # 1), ¶ 2.) As an instrumentality of a foreign state, Norinco removed the action to this Court on August 14, 2006, pursuant to 28 U.S.C. § 1441(d). (Notice of Removal (Doc. # 1), ¶¶ 3-4.) Pursuant to the same code section, this action is to be tried by the Court without a jury. 28 U.S.C. § 1441(d).

### III. DISCUSSION

#### A. Summary Judgment Standard

This Court is well-acquainted with the burden that a non-moving party has to defeat a properly supported motion for summary judgment. The nonmovant "may not rest upon the mere allegations or denials of [his] pleading, but [his] response . . . must set

forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). Indeed, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

### B. Plaintiff's Own Negligence Caused His Injury.

At the time of the Plaintiff's injury, it is undisputed that he was handling a loaded and cocked shotgun with the safety disengaged, and that he had placed his right hand over the muzzle of the gun at the same time the trigger was engaged. (B. Bonner Dep., p. 76, lines 8-9; p. 80, lines 16-21); (Report of John T. Butters, p. 2, lines 7-28). The Alabama Supreme Court's recent opinion in a similar gun case, establishes that the danger of handling a gun in this way is self-evident, such that Plaintiff's claims are barred as a matter of law.[1]  *Burleson v. RSR Group Florida, Inc.*, No. 1050360, 2007 Ala. LEXIS 195, at *11-12 (Ala. Sept. 21, 2007).

In *Burleson*, the plaintiffs alleged that the defective design of a revolver had proximately caused the death of Stanley Burleson, the decedent. *Id.* at *1. The decedent was hanging the revolver in its holster on a gun rack when the revolver fell from the holster, struck a desk, and discharged. *Id.* at *6. The decedent was struck in the abdomen by the discharged round and died as a result of the wound. *Id.* The plaintiffs contended that the revolver was defective because it was designed without an internal passive safety device that would have prevented it from discharging when it fell and struck the desk. *Id.* The defendant argued that the decedent was contributorily negligent

---

[1]  Alabama law applies to Norinco in this case pursuant to 28 U.S.C. § 1606.

8

because he failed to engage the manual safety and because he was putting the revolver away with a cartridge chambered directly in line with the hammer and the firing pin. *Id*. at *7.

In *Burleson* it was undisputed that the decedent was "safety conscious" and that he was aware of the importance of never storing a loaded gun, much less one with a cartridge chambered in line with the hammer and the firing pin. *Id*. at *9, *12. It was also undisputed that the manual safety on the revolver was disengaged when the decedent was placing the holstered revolver on the gun rack. *Id*. at *8-9. The plaintiffs' expert, John T. Butters (who is also an expert for Plaintiff in the present case), testified that the manual safety had to be disengaged for the revolver to fire. *Id*. at *5. Based on that undisputed evidence, the court concluded that the decedent placed himself in danger's way:

> [T]he danger of handling a firearm with a live cartridge chambered in line with the hammer and the firing pin without having first engaged the manual safety is self-evident, especially to an experienced and safety-conscious gun owner like [the decedent], so that reasonable people would have to logically conclude that he *should have* at least appreciated the danger associated with doing so.

*Id*. at *11-12 (emphasis in original). The court held that the decedent's own contributory negligence barred the plaintiffs' recovery, regardless of whether the revolver was defective as designed and regardless of whether there was any causal connection between the defendant's activities and the decedent's death. *Id*. at *7, *12.

Plaintiff in the present case was well-aware of the rules of safe gun handling. He had been taught gun safety since he was just four years old—twelve years before his injury. (O. Knowles Dep., p. 11, lines 12-20; p. 13, lines 1-15.) Plaintiff's own

9

testimony establishes that he understood that it is unsafe to have a gun cocked unless you are ready to fire it, that it is unsafe to have the safety disengaged unless you are ready to fire it, and that it is unsafe to point the gun at anything you do not intend to shoot. (B. Bonner Dep., p. 26, lines 11-20.) Despite Plaintiff's understanding of these basic safety rules, it is undisputed that he violated each of them when he injured his right hand.

After the shotgun allegedly "misfired," Plaintiff failed to engage the gun's safety despite knowing that the gun was loaded and cocked. He also failed to unload the gun before inspecting it further. Moreover, Plaintiff placed his right hand over the muzzle of the loaded, cocked shotgun, while engaging the trigger. Reasonable people would have to logically conclude that Plaintiff, particularly given his knowledge of gun safety rules, appreciated the danger of handling the shotgun in this way. Plaintiff's own negligence caused his injury, and his claims are therefore barred as a matter of law. *See Burleson*, 2007 Ala. LEXIS 195, at *11-12; *see also Aplin v. Tew*, 839 So. 2d 635 (Ala. 2002) (affirming judgment as a matter of law for defendants after concluding that 14-year-old plaintiff's negligence proximately contributed to injuries he suffered while handling fireworks).

### C.    Plaintiff's Claims Are Based on Conjecture.

Even ignoring the evidence establishing that Plaintiff's injury was caused by his own negligence, summary judgment would still be proper in this case because there is no evidence that any alleged defect in the shotgun contributed to Plaintiff's injury. Each of Plaintiff's claims is based on the allegations that the subject shotgun "fell apart and unexpectedly fired into and through" Plaintiff's right hand. (Complaint ¶ 7.) Plaintiff's deposition testimony, however, revealed that the allegation that the shotgun "fell apart" is

based on nothing more than his own conjecture. (B. Bonner Dep., p. 88, lines 7-23; p. 89, lines 1-3; p. 110, lines 14-16.) Indeed, the evidence shows that the shotgun was in one piece when it was retrieved after the accident. (C. Dennis Dep., p. 18, lines 2-11.) There is simply no evidence supporting a claim that the barrel became detached from the shotgun while Plaintiff was handling it. Plaintiff's case, however, is entirely dependent on such evidence. It is the basis of his Complaint and it is the basis of his expert's theory of causation.

Plaintiff's expert on causation, John T. Butters (the same expert used by the plaintiffs in *Burleson v. RSR Group Florida, Inc.*) has opined that "the firearm discharged during [Plaintiff's] attempt to prevent the barrel from falling off due to an inadvertent trigger pull occasioned by the barrel suddenly and unexpectedly breaking off the gun." (Report of John T. Butters, p. 2, lines 27-29.) Mr. Butters bases his opinion on the notion that "the barrel was loose and slipping forward" and that Plaintiff "caught the barrel to prevent it falling off and pulled it back into the action whereupon the gun discharged and severely injured his hand." (Report of John T. Butters, p. 1, lines 5-7.)

Mr. Butters report, like Plaintiff's Complaint, finds no support in the record. Such conclusory allegations are insufficient to avoid summary judgment. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (stating that "conclusory allegations without specific supporting facts have no probative value" and affirming summary judgment for defendant).

## IV. CONCLUSION

For the foregoing reasons, defendant Norinco respectfully requests that the Court enter judgment in its favor on all claims asserted against it by Plaintiffs.

Respectfully submitted,


s/ James C. Barton, Jr.
James C. Barton, Jr. (BAR014)
Bar Number:  ASB-0237-B51J
Email: jbartonjr@johnstonbarton.com

s/ Alan D. Mathis
Alan D. Mathis (MAT052)
Bar Number:  ASB-8922-A59M
Email:  adm@johnstonbarton.com

Attorneys for defendant
China North Industries Corporation


**JOHNSTON BARTON PROCTOR & ROSE LLP**
Colonial Brookwood Center
569 Brookwood Village, Suite 901
Birmingham, Alabama  35209
(205) 458-9400
(205) 458-9500 (FAX)

  **OF COUNSEL**

## **CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the above and foregoing with the Clerk of the Court on February 14, 2008, using the CM/ECF system, which will send notification of such filing to the following:

David J. Hodge, Esq.
PITTMAN, DUTTON, KIRBY & HELLUMS, P.C.
2001 Park Place North
1100 Park Place Tower
Birmingham, Alabama 35203

Nick Wooten, Esq.
WOOTEN & CARLTON, P.C.
P.O. Drawer 290
Lafayette, Alabama  36862

Todd M. Higey, Esq.
RICHARDSONCLEMENT, P.C.
200 Cahaba Park Circle
Suite 125
Birmingham, Alabama  35242

                                              s/ Alan D. Mathis
                                              Of Counsel

W0631341.DOC