IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN BONNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:06-cv-00715-MHT |
| | ) | |
| INTERSTATE ARMS CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO CHINA NORTH INDUSTRIES CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Brian Bonner offers this memorandum brief in opposition to the motion for summary judgment filed by China North Industries Corporation ("Norinco"). For the reasons stated herein, plaintiff asks this Court to deny Norinco's request for a summary judgment.

### Norinco's Asserted Grounds

On February 14, 2008, Norinco electronically filed (1) a motion for summary judgment, (2) supporting memorandum brief, and (3) specified evidentiary materials. In the summary-judgment motion, Norinco generically asserted that it was entitled to a summary judgment because "there is no genuine issue of material fact and Norinco is entitled to judgment as a matter of law." *Defendant China North Industries Corporation's Motion for Summary Judgment* at 1. In its supporting memorandum brief, Norinco asserted two specific grounds.

The first ground was that "the evidence [in the record] demonstrates that it was Plaintiff's own negligence that proximately caused Plaintiff's injury." *Brief in Support of Defendant China North Industries Corporation's Motion for Summary Judgment* at 1. Norinco contended that Brian Bonner was contributorily negligent as a matter of law and that, if he was contributorily negligent, he is barred him from recovering monetary damages from Norinco. *Id*. at 8-10.

The second ground was that "there is no evidence that any alleged defect in the shotgun contributed to Plaintiff's injury." *Id*. at 10. Specifically, Norinco contended that "[t]here is simply no evidence supporting a claim that the barrel became detached from the shotgun while Plaintiff was handling it." *Id*. at 11. According to Norinco, "Plaintiff's case ... is entirely dependent on" the barrel becoming detached from the shotgun while Brian Bonner was handling it and this fact, the barrel detaching, "is the basis of his Complaint and ... the basis of his expert's theory of causation." *Id*. at 11.

Before proceeding, Brian Bonner would point out that, in its "Statement of Facts," Norinco wrote:

> The subject shotgun is a Norinco Model 98, 12-gauge, 18-inch barrel, pump shotgun, serial number 0016971. (Report of John T. Butters, p. 1, lines 2-3.) Norinco did not manufacture the subject shotgun. (Motion for Leave to File Plaintiff's Second Amended Complaint (Doc. #40), ¶ 5.) The shotgun was sold to Norinco in July 1999. (Norinco's Response to Plaintiff's Interrogatories, ¶ 2.) Norinco exported the shotgun to the United States through Interstate Arms, the importer, in November 1999. *Id*.

*Id*. at 2-3. In seeking a summary judgment, Norinco did not assert that it cannot be held legally liable under Alabama products-liability law because Norinco did not actually manufacture the subject shotgun. At least for purposes of this summary-judgment

proceeding, Norinco admits that the subject shotgun is "a Norinco Model 98." Since the issuance of *Sears, Roebuck & Co. v. Morris*, 273 Ala. 218, 136 So. 2d 883 (1961), it has been Alabama law that an entity that places its own trade name on a product is treated as the product's manufacturer for purpose of imposing legal liability for introducing a defective product into the commercial market. *See also Atkins v. American Motors Corp.*, 335 So. 2d 134, 143 (Ala. 1976). In the present matter, Norinco must be treated as the manufacturer of the subject shotgun, and not a mere distributor.

<u>Basic Summary-Judgment Principles</u>

"The party moving for summary judgment always has the burden of persuasion on such motion," only "[t]he burden of going forward [with proffering evidence]... [may] shift during the motion process." Steven Baicker-McKee et al., *Federal Civil Rules Handbook 2008* at 56 (2007). In a summary-judgment proceeding, a trial court may never weigh the evidence or find the facts; instead, the trial court is narrowly restricted to determining the threshold issue of whether there is a genuine issue as to material facts that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Therefore, the evidence proffered by the non-movant must be accepted as true and must be viewed in the light most favorable to the nonmovant, with all doubts resolved against the movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Additionally, the non-movant enjoys the benefit of all reasonable inferences that may be drawn in the non-movant's favor. *Id.* A reasonable inference need not be the more probable or likely than other inference but need only be an inference that may be

reasonable drawn from the evidence. *See Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1552, 143 L. Ed. 2d 731 (1999); *Patterson & Wilder Const. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).

To avoid constitutional concerns, in a summary-judgment proceeding, the movant must effectively rely solely on truly undisputed facts because a summary judgment should only be granted if the movant is entitled to a summary judgment based on the application of the applicable legal principles to the factual record viewed in the light most favorable to the non-movant. In a summary-judgment proceeding, the movant must accept the non-movant's "best case" and persuade the court that, under the applicable law, the non-movant could never prevail under the non-movant's "best case." Thus, the movant's "Statement of the Fact" must be a recounting of truly undisputed facts and should never be the movant's "version" of the factual record.

<u>Statement of Pertinent Facts</u>

As demonstrated herein, Norinco presented its version of the factual record and its inference from its version of the factual record. Also, as demonstrated herein, Norinco ignored material facts found in the record.

Out of a concern for brevity, Brian Bonner will incorporate his statement of pertinent facts into his argument section of this memorandum brief. Presently, Brian Bonner would point out a few "highlights" of his rendition of the salient facts; in the argument section, references to the factual record will be cited. Brian Bonner was just sixteen when the underlying accident occurred. Brian Bonner had merely "target" shot various firearms and understood very basic gun-safety rules. Brian Bonner knew little

about the inner workings of firearms and had never disassembled a firearm. Brian Bonner picked out the subject Norinco shotgun because he liked its color and small barrel length. Brian Bonner possessed the shotgun for just ten days prior to the underlying accident. While an eleven-year old friend was shooting the shotgun, the shotgun failed to discharge or jammed. Brian Bonner took hold of the shotgun so that his friend could fetch an adult because Brian Bonner appreciated that a knowledgeable adult should determine why the shotgun failed to discharge or jammed. While Brian Bonner was holding the shotgun with the barrel pointed upward, Brian Bonner sensed the barrel sliding off. Instinctively, Brian Bonner placed his right hand on top of the barrel to stabilize the barrel. Inadvertently, Brian Bonner's left hand hit the trigger causing the shotgun to discharge. Expert testimony was offered that the barrel came loose due to defective manufacture or design; specifically, two experts opined that the weld, brazing joint or soldered stud securing the barrel failed due to defective manufacture or design. Brian Bonner was injured in a foreseeable accident scenario and because the subject Norinco shotgun was defective or unreasonably dangerous.

<u>Argument</u>

**Norinco utterly fails to conclusive prove that Brian Bonner was contributorily negligent as a matter of law.**

In its supporting memorandum brief, Norinco cited and discussed but two Alabama appellate opinions, namely, *Burleson v. RSR Group Florida, Inc.*, ___ So. 2d ___, 2007 WL 2745781 (Ala. Sep. 21, 2007), and *Aplin v. Tew*, 839 So. 2d 635 (Ala. 2002). Norinco ignored general principles regarding contributory negligence as a matter of law found in Alabama appellate opinions.

"The question of contributory negligence is normally one for the [trier of fact to resolve at trial]." *Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 860 (Ala. 2002). To establish contributory negligence as a matter of law in a summary-judgment proceeding, Norinco bears a very heavy burden. *See H.R.H. Metals v. Miller*, 833 So. 2d 18, 26-28 (Ala. 2002). In establishing contributory negligence as a matter of law in a summary-judgment proceeding, an additional element is added to the standard elements of this affirmative defense that must be proven at trial; namely, Norinco must demonstrate "the plaintiff's appreciation of the danger was a conscious appreciation at the moment the incident occurred." *Hicks v. Commercial Union Ins. Co.*, 652 So. 2d 211, 219 (Ala. 1994)(citations omitted). As stated by the Supreme Court of Alabama:

> To establish contributory negligence as a matter of law, a defendant seeking a summary judgment must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident occurred. The proof required for establishing contributory negligence as a matter of law should be distinguished from an instruction given to a jury when determining whether a plaintiff has been guilty of contributory negligence. A jury determining whether a plaintiff has been guilty of contributory negligence must decide only whether the plaintiff failed to exercise reasonable care. We protect against the inappropriate use of a summary judgment to establish contributory negligence as a matter of law by requiring the defendant on such a motion to establish by undisputed evidence a plaintiff's conscious appreciation of danger.

*Hannah*, 840 So. 2d at 860-61 (citations omitted). In other words, Norinco must conclusively prove that Brian Bonner had a "conscious appreciation of the danger at the moment [the injury] occurred." Moreover, while the trier of fact at trial must use an objective standard in deciding if a plaintiff was contributorily negligent by not exercising due care, a court in a summary-judgment proceeding must use a more subjective standard

in deciding whether a plaintiff consciously appreciated the danger at the moment the incident occurred.

In *Hannah*, as well as in *Elba Wood Products, Inc. v. Brackin*, 356 So. 2d 119 (Ala. 1978); *Jones by and through Jones v. Power Cleaning Contractors*, 551 So. 2d 996 (Ala. 1989); *Bridges v. Clements*, 580 So. 2d 1346 (Ala. 1991); and *Gulledge v. Brown & Root, Inc.*, 598 So. 2d 1325 (Ala. 1992), the Supreme Court of Alabama declared that mere "heedlessness" or "forgetfulness" will not support a finding of contributory negligence as a matter of law and that a general appreciation of a potentially hazardous condition is not the same as a "present" conscious appreciation of the specific hazard.

Under Alabama law, a determination of contributory negligence as a matter of law must be the rare exception. As previously noted herein, in *Hannah*, the Supreme Court of Alabama cautioned against a trial judge finding contributory negligence as a matter of law unless there is undisputed evidence of the plaintiff's conscious appreciation of the specific danger.

In *Aplin v. Tew*, 839 So. 2d 635 (Ala. 2002), one of the opinions cited by Norinco, the Supreme Court of Alabama did affirm the trial court's granting of a judgment as a matter of law after the plaintiff rested his case-in-chief at trial based on a 14-year-old plaintiff's contributory negligence as a matter of law in connection with his handling of fireworks. Aplin had placed some loose firecrackers in his waistband; as he was walking, a bottle rocket struck him and ignited the firecrackers in his jeans. Aplin unsuccessfully argued that there was not conclusive evidence of his then-present conscious appreciation of the danger posed by carrying firecrackers on his person. Fatal to Aplin's argument was his admission "on cross-examination that he knew that placing fireworks in his

waistband was dangerous and that he knew the fireworks placed in his waistband would explode if they were ignited." 839 So. 2d at 638. Alpin could not rely on his surprise as to the "specific means" by which the firecrackers were ignited since "[t]he evidence [was] undisputed that he placed himself in harm's way by putting firecrackers in his clothing while in the presence of ignited fireworks and that he was aware of the danger of such circumstances." 839 So. 2d at 639. The "specific" danger was carrying the firecrackers in his waistband where they might be ignited. The particular facts, including Alpin's admissions, permitted a determination of contributory negligence as a matter of law.

In *Burleson v. RSR Group Florida, Inc.*, ___ So. 2d ___, 2007 WL 2745781 (Ala. Sep. 21, 2007), the other opinion cited by Norinco, the plaintiffs brought a wrongful-death action. Stanley Burleson, the deceased, was a mature adult. His widow "testified that Stanley had a 'rule' that all firearms he kept in the house be stored unloaded." His surviving son "testified that Stanley was 'safety conscious' and had taught him the importance of never keeping a live round chambered in line with the hammer and the firing pin." Stanley Burleson was a mature adult **and** an experienced gun owner. The deceased had placed his single-action revolver in its holster and was in the process of hanging the holstered revolver on a gun rack when the revolver fell from the holster, struck a desk and discharged. It was undisputed that there would have been no discharge if the revolver had been unloaded. Despite being "safety conscious" and in violation of his own personal "safety" rule, Stanley Burleson did not unload the revolver before storing it. The majority of justices found that, in light of the statements regarding Stanley Burleson's "safety consciousness" regarding handling his firearms, the only possible

factual conclusion was that Stanley Burleson consciously appreciated the danger of not unloading his revolver before putting it up. Stanley Burleson consciously breached his own "safety" rule; if he had unloaded his revolver, there would have been no discharge. Again, the particular facts, including Stanley Burleson's personal rule against storing a loaded weapon, permitted a determination of contributory negligence as a matter of law.

In the present matter, it is not enough for Norinco to cite an Alabama appellate opinion in which a teenager was found to have been contributorily negligent as a matter of law and to cite another Alabama appellate opinion in which an adult who did not unload his revolver before endeavoring to place it on a gun rack was found to have been contributorily negligent. Instead, Norinco must point out **undisputed evidence** of Brian Bonner's conscious appreciation of danger as he was handling the subject shotgun when it discharged and must conclusively negate that Brian Bonner was merely "heedless" or "forgetful." Norinco, as well as this Court, may not rely on Norinco's version or "reading" of the proffered deposition testimony. Norinco, as well as this Court, must accept the version or "reading" of the proffered deposition testimony that is most favorable to Brian Bonner. In its supporting memorandum brief, Norinco totally ignored this general principle and relies on its version or "reading" of the proffered deposition testimony.

On November 15, 2003, Brian Bonner was sixteen years old. (Deposition of Brian Joseph Bonner at 21)(Norinco submitted a copy of Brian Bonner's deposition as "Exhibit A" to *Defendant China North Industries Corporation's Evidentiary Submission in Support of Its Motion for Summary Judgment*) From a young age, he had been exposed to firearms. (*Id*. at 18) He had never gone hunting with a firearm; instead, he

had only engaged in shooting stationary targets.  (*Id.* at 20-21)  Brian Bonner had never

disassembled a firearm or dismounted a barrel from a shotgun.  (*Id.* at 29-30).  Brian

Bonner did not know how to dismount a barrel on a shotgun.  (*Id.* at 48)  Brian Bonner

decided to purchase the subject Norinco shotgun because he liked that it was black and its

eighteen-inch barrel that made the shotgun "easier for [him] to hold."  (*Id.* at 37-38)

Through his mother, Brian Bonner purchased the subject Norinco shotgun on November

5, 2003.  (*Id.* at 44)  Between November 5th and 15th, Brian Bonner fired the subject

Norinco shotgun a few times on three or four occasions.  (*Id.* at 51)

Brian Bonner had been taught basic gun safety:

> Never keep [a weapon] loaded.  If it has any shells in it,
> don't have it cocked back or ready to be fired until you are
> ready to shoot it.  Always keep it on safety and never have
> it aimed at anybody or anything unless you know you're
> going to shoot a target or something.

(*Id.* at 26)  Brian Bonner appreciated that, generally, he should not walk around with a

loaded weapon.  (*Id.*)  When asked "what [he should] do if a gun fails to fire," Brian

Bonner replied:  "I guess, try to get somebody that knows what they're doing to check it

out."  (*Id.* at 27-28)

Brian Bonner was not very knowledgeable about the workings of firearms,

including shotguns.  He had never disassembled a firearm; he did not know how to

dissemble a firearm.  Brian Bonner had only engaged in basic target shooting.  There is

no indication that he had ever confronted or even observed an incident where a firearm

misfired or jammed.  As he testified, he thought that it would be good to seek the help of

a knowledgeable adult if a firearm misfired or jammed.  Brian Bonner selected the

subject Norinco shotgun based on its color and barrel size. Brian Bonner was simply a causal shooter of firearms who knew very little about how firearms functioned.

Brian Bonner had been taught just basic "gun safety" rules. There is no evidence that anyone schooled him what to do if a firearm misfired or jammed. Brian Bonner could only speculate that it would be best to seek the help of a knowledgeable adult if he encountered a misfire or jamming incident. Brian Bonner was unaware of any specific acts he should do if such an incident occurred.

As to the underlying accident, Brian Bonner testified that, while B. J. Sadler was shooting the subject Norinco shotgun, he heard a metal sound and the shotgun failed to fire or jammed. (*Id*. at 66-67 & 69-70) Then, Brian Bonner took the shotgun from B. J. Sadler so that B. J. Sadler could go get some assistance from an adult. (*Id*. at 72 & 78) [At the time of this accident, B. J. Sadler was eleven or twelve years old. (Deposition of Christopher Dennis at 32)(Norinco submitted a copy of Christopher Dennis's deposition as "Exhibit E" to *Defendant China North Industries Corporation's Evidentiary Submissions in Support of Its Motion for Summary Judgment*)] Brian Bonner took hold of the shotgun with both hands, left hand on the bump area and right hand on the stock. (*Id*. at 74) When, while pointed upward, the barrel started to move, giving the impression of beginning to fall off, Brian Bonner reflexively grabbed the barrel with his right hand. (*Id*. at 73 & 75) The following exchange occurred in Brian Bonner's deposition:

> QUESTION: Is it possible, when you were out there in the field right before you injured yourself, that the barrel did not fall off?
>
> ANSWER: I really don't know. **I believe it was sliding off.**

(*Id.* at 87-88)(Emphasis added.)  Without knowing why, Brian Bonner's right hand instinctively grabbed the top of the barrel.  (*Id.* at 75-76)  Suddenly and unexpectedly, the shotgun discharged, injuring Brian Bonner's right hand.  (*Id.* at 76)  It is undisputed that B. J. Sadler was only a short distance away when the shotgun discharged.  (*Id.* at 80)

Brian Bonner testified that, when the subject Norinco shotgun misfired or jammed, he took possession of the shotgun from the younger B. J. Sadler, certainly, a reasonable act under the circumstances.  Brian Bonner testified that he instructed B. J. Sadler to go to the nearby house and fetch an adult, certainly, a reasonable act under the circumstances given Brian Bonner's age and lack of any knowledge regarding the workings of firearms.  Brian Bonner testified that he held the shotgun with the barrel pointed upward, certainly a reasonable act under the circumstances.  Brian Bonner testified that, as B. J. Sadler was walking away, the barrel of the shotgun seemed to slide off and he instinctively grabbed the top of the barrel with his right hand.  Brian Bonner never said that he tried to unjam the shotgun or to determine why the shotgun misfired or jammed.  To the contrary, his testimony supports a finding that he simply took possession of the shotgun with the intention of holding it with the barrel pointed upward until an adult came to take charge of the shotgun.  His testimony supports a finding that Brian Bonner would have still been standing holding the shotgun with the barrel pointed upward when an adult arrived if he had not sensed the barrel seeming to slide off.  Brian Bonner's intention was to do nothing with the shotgun but to hold it with the barrel pointed upward because he appreciated that he did not know how to deal with a jammed shotgun.

Norinco seeks to rely on a bunch of hearsay or the speculation of non-eyewitnesses that Brian Bonner attempted to unjam the shotgun, something that he affirmatively denied and is inconsistent with the discharge occurring shortly after Brian Bonner took the shotgun from B. J. Sadler and after B. J. Sadler had just walked a short distance away.  After hearing testimony at trial, the trier of fact may accept Brian Bonner's version of events and reasonably find that Brian Bonner did nothing but instinctively react to a feeling that the barrel was started to slide off.  There is a total absence of undisputed evidence that Brian Bonner consciously appreciated any danger if he held the shotgun with the barrel pointed up until an adult arrived to take possession of the shotgun.  There is absolutely no evidence that, prior to the incident, Brian Bonner appreciated that the subject Norinco shotgun's barrel was loose; Brian Bonner was surprised when the barrel started to slide off.  There is no undisputed evidence that Brian Bonner tried to unjam the shotgun; instead, there is his testimony that he chose to do nothing but hold the shotgun until an adult arrived to take possession of the shotgun. Brian Bonner followed his "safety rule" of letting a knowledgeable adult deal with the misfiring or jammed shotgun.

Following Brian Bonner's accident, Chris Dennis volunteered to retrieve the subject Norinco shotgun and other weapons that had been left at the accident scene so "nobody else [would] pick them up."  (Deposition of Christopher Dennis at 17)  When Chris Dennis found the subject Norinco shotgun, he observed "one shell hanging halfway out the chamber."  (*Id*. at 18)  As Chris Dennis was carrying the subject Norinco shotgun from his vehicle into his house, "the whole barrel fell of the [shot]gun."  (*Id*. at 19-20) The following exchange occurred in Chris Dennis's deposition:

> QUESTION:  When you first picked upon the 12 gauge, did you notice that the barrel was loose or anything?

> ANSWER:  I didn't really pay too much attention to it.

(*Id*. at 20)  In other words, Chris Dennis never testified that the barrel was securely affixed to the subject shotgun when he picked it off the ground.  Chris Dennis merely testified that the barrel did not fall off until he was entering his residence.  Chris Dennis's statements do not refute Brian Bonner's testimony that he sensed the barrel beginning to slide.  It is reasonable to infer that the barrel was loose when Brian Bonner took possession of the shotgun from B. J. Sadler but that the barrel did not completely disengage and fall off until later.

In summation, Brian Bonner's description of the events surrounding the underlying accident belies any conscious appreciation of the particular danger, much less a "present" conscious appreciation that the barrel might begin to move or slide.  Brian Bonner did not voluntary place his right hand at the top of the shotgun's barrel; instead, in a sudden, instinctive reaction, he moved his right hand to the top of the barrel when he sensed the barrel beginning to slide off.  Brian Bonner was not "fooling around" with the shotgun attempting to discover why the shotgun had failed to fire.  If Brian Bonner's testimony is accepted as true, then, he did not act unreasonable and, certainly, was not contributorily negligent as a matter of law.  Norinco woefully failed to prove contributory negligence as a matter of law; this is not one of those very rare occasions were a trial court may find contributory negligence as a matter of law.

**Brian Bonner proffers ample substantive evidence that the subject Norinco shotgun was defective and that this defectiveness of a proximate cause of his injuries.**

The extreme brevity of Norinco's argument regarding its second asserted ground as to why it is entitled to the requested summary judgment evinces the "shallowness" of Norinco's argument, as well as the lack of merit in its argument.  Norinco cited but a single legal authority, namely *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1986); again, evincing the non-meritorious nature of Norinco's argument.

In *Evers*, Marcia Evers was severely injured when a Toyota ran a stop sign and struck the left side of her Grand Prix near the driver's door.  She contended that the Grand Prix was defectively designed due to the absence of air bags, meaning an air bag in the steering wheel.  In opposing General Motors's summary-judgment motion, Evers relied on an affidavit executed by Carl Thelin, a design engineer.  In his terse affidavit, Thelin stated:

> Based on my analysis, it is my opinion that an "air bag" occupant restraint system would probably have reduced the severity of, or prevented, the injury sustained by Marcia Evers in this collision.
>
> It is my further opinion that the failure of General Motors Corporation to incorporate an "air bag" system of automatic crash protection for the occupants of this automobile constituted a defect in the design of the automobile.

770 F.2d at 986 n.2.  The Eleventh Circuit observed that "the Thelin affidavit ... fail[ed] to provide any specific facts to support appellant's claim" and, "[m]oreover, this affidavit sharply contradicted the earlier deposition testimony of Dr. Huelke, who as a witness for [Evers], explained at deposition that air bags are not designed to provide protection in a

side impact, and that there was no defect in the vehicle related to [Ever's] injuries." 770 F.2d at 986.

Norinco correctly noted that the Eleventh Circuit observed that "conclusory allegations without specific supporting facts have no probative value" and held that General Motors was entitled to a summary judgment based on the conclusory nature of Thelin's affidavit. Norinco ignored that the Eleventh Circuit's observations that air bags were not designed to protect passengers in a side-impact collision and that Dr. Huelke detailed how no defect in the Grand Prix's design related to Evers's injuries. Norinco ignored that the Eleventh Circuit merely found that Thelin's affidavit testimony consisted of factually unsupported conclusions.

To this Court, Norinco argued:

> ... Each of Plaintiff's claims is based on the allegations that the subject shotgun "fell apart and unexpectedly fired into and through" Plaintiff's right hand. (Complaint ¶ 7.) Plaintiff's deposition testimony, however, revealed that the allegation that the shotgun "fell apart" is based on nothing more than his own conjecture. (B. Bonner Dep., p. 88, lines 7-23; p. 89, lines 1-3; p. 110, lines 14-16.) Indeed, the evidence shows that the shotgun was in one piece when it was retrieved after the accident. (C. Dennis Dep., p. 18, lines 2-11.) There is simply no evidence supporting a claim that the barrel became detached from the shotgun while Plaintiff was handling it. Plaintiff's case, however, is entirely dependent on such evidence. It is the basis of his Complaint and it is the basis of his expert's theory of causation.

*Brief in Support of Defendant China North Industries Corporation's Motion for Summary Judgment* at 10-11.

The republished argument is predicated on plaintiff's counsel's incorrect factual allegation in the complaint that the subject Norinco shotgun "fell apart" just prior to

discharging. Brian Bonner concedes that the shotgun's barrel did not completely fall off as he was holding the shotgun with the barrel pointed upward while B. J. Sadler walked to the nearby house to fetch an adult. Yet, Norinco cannot choose to ignore Brian Bonner's pertinent deposition testimony. As detailed in the previous subsection of this memorandum brief, Brian Bonner affirmatively testified that, as he was holding the subject Norinco shotgun, he sensed that the barrel beginning to slide off, giving the impression that the barrel was going to fall off. (Deposition of Brian Joseph Bonner at 73, 75 & 87-88) Brian Bonner's affirmative deposition testimony "trumps" or overrides any factual allegations in the complaint. Brian Bonner's causation theory is not predicated on the barrel becoming wholly "detached from the shotgun while [he] was handling it." Instead, his causation theory is predicated on the barrel becoming detached or loose "while [he] was handling it." The looseness caused Brian Bonner to think that the barrel was about to fall off, causing him to react instinctively to try to keep the barrel from falling off. Unfortunately, his instinctive reaction resulted in his right hand grabbing the top of the barrel and his left hand accidentally coming in contact with the trigger.

Brian Bonner's causation theory rests on the fact that the subject Norinco shotgun was defective or unreasonably dangerous because the weld or welds holding the barrel in place were either defectively welded or defectively designed. Brian Bonner retained Raymond Thompson as an expert witness. Plaintiff is separately filing with this Court an affidavit executed by Raymond Thompson in which he authenticates "Hodge Shotgun Report – 18800" as a report that he prepared following his inspection and testing of the subject Norinco shotgun and reaffirms the opinions contained in that report. Raymond

Thompson earned a Ph.D. in materials science and engineering from Vanderbilt University in 1979; is a registered engineer in Alabama, Arkansas and South Carolina; and is a Fellow in both the American Society of Materials and the American Welding Society. *Hodge Shotgun Report – 18800* at 6. As an academic and in his private professional practice, Dr. Thompson has actively engaged in matters of engineering design and failure analysis, including as an expert in lawsuits. *Id*. at 6-7. Dr. Thompson examined the subject Norinco shotgun and performed tests on the braze joint between the shotgun's barrel and the ring attaching the barrel to the magazine tube. *Id*. at 1-4. He observed that "[t]he braze was found to be heavily populated with flux that was not removed from the joint during the brazing process;" that "[m]ost of the braze surface is composed of braze metal that did not stick to the steel;" and that "[m]ost of the poorly adhered braze [is] on the barrel side which means not enough heat was used to make a strong brazed joint." *Id*. at 3-4. These observations, as well as his other observation, formed the basis on Dr. Thompson's analysis that:

> The brazed joint was poorly made and defective for that reason. The braze did not adhere to either the ring or the barrel. The lack of strength of this braze joint is the cause of the separation of the barrel from the magazine. The cause of this poor manufactured braze joint is most likely poor heating of the joint during brazing. The joint has entrapped flux which shows that not enough capillary force was developed to remove it during brazing. Poor fluxing would also contribute to the lack of adhesion between the braze and the steel.
>
> ...
>
> The combination of large areas of trapped flux and no adhesion to the steel surfaces caused the defect in this joint that caused it to break far below its intended strength.

18

*Id.* at 4-5.  Based on his professional experience coupled with his examination and testing of the subject Norinco shotgun, Dr. Thompson opined:  "The gun examined for this report was defective in the brazed joint that connected the barrel to the magazine.  The defective braze joint caused the separation of the barrel [from] the magazine." *Id.* at 6

In other words, Dr. Thompson proffered admissible expert opinion testimony as to why Brian Bonner sensed looseness in the barrel, the weld or welds holding the barrel in place began to fail.  As important, Dr. Thompson proffered admissible expert opinion testimony linking the failure of the weld or welds to defects in the manufacture and/or design of the subject Norinco shotgun.  The weld or welds, or braze joint as used by Dr. Thompson, were inadequate to properly hold the barrel in place.  Adequate welds or braze joints would not have failed.  From Dr. Thompson's expert opinion testimony, the trier of fact may reasonably find that the subject Norinoc shotgun was either defectively manufactured or designed because, if the shotgun had been properly manufactured or designed, the welds or braze joints should not have failed as they did.

To this Court, Norinco argued:

> Plaintiff's expert on causation, John T. Butters (the same expert used by the plaintiffs in *Burleson v. RSR Group Florida, Inc.*) has opined that "the firearm discharged during [Plaintiff's] attempt to prevent the barrel from falling off due to an inadvertent trigger pull occasioned by the barrel suddenly and unexpectedly breaking off the gun." (Report of John T. Butters, p.2, lines 27-29.)  Mr. Butters bases his opinion on the notion that "the barrel was loose and slipping forward" and that Plaintiff "caught the barrel to prevent it falling off and pulled it back into the action whereupon the gun discharged and severely injured his hand." (Report of John T. Butters, p. 1, lines 5-7.)

*Brief in Support of Defendant China North Industries Corporation's Motion for Summary Judgment* at 11.

Brian Bonner is uncertain as to why Norinco would inform this Court that John Butters was a plaintiff-retained expert in *Burleson v. RSR Group Florida, Inc.*, ___ So. 2d ___, 2007 WL 2745781 (Ala. Sep. 21, 2007).  In *Burleson*, the Supreme Court of Alabama did not find John Butters's opinions to be speculative or unsupported by the factual record.  In *Burleson*, the Supreme Court of Alabama did not address whether, relying of John Butters's opinion testimony, the personal representative failed to create a genuine question as to whether the subject pistol was defective or unreasonably dangerous.  Instead, in *Burleson*, the sole issue was whether the deceased had been contributorily negligent as a matter of law.  The finding of contributory negligence as a matter of law eliminated any need to consider whether the personal representative could prove that the pistol was defective.  Nothing in *Burleson* discredits John Butters's credentials or qualifications as a firearm's expert.

Norinco submitted a copy of John Butters's report as "Exhibt G" to its *Defendant China North Industries Corporation's Evidentiary Submission in Support of Its Motion for Summary Judgment*.  Like Dr. Thompson, after examining the barrel stud or the weld or braze joint, John Butters concluded that the stud or soldered joint "failed due to inadequate solder flow and adherence in the interface between the stud and the barrel." *Report of John T. Butters* at 1.  John Butters found no signs of abuse, misuse or modification that might explain a weakening or compromising of the integrity of the shotgun's assembly.  *Id*.  In other words, the stud or soldered joint failed due to defect manufacture or design.

As significant, based on Brian Bonner's descriptive account, John Butters concluded that, when Brian Bonner noticed that the barrel was loose and slipping, Brian Bonner attempted to prevent the barrel from falling off.  *Id.* at 2.  Based on his professional experience, John Butters opined that the "metal" click heard by Brian Bonner was either the breakage of the faulty barrel stud solder joint or a loose stud and ring sliding on the magazine tube and that, as Brian Bonner attempted to prevent the barrel from falling off by grabbing the top of the barrel with his right hand, he inadvertently pulled the trigger with his left hand.  *Id.*  According to John Butters, Brian Bonner's reaction to a loose or sliding barrel was foreseeable and not unexpected.  *Id.*

The trier of fact may reasonably find that the defective manufacture or design of the subject Norinco shotgun was a contributing proximate cause of Brian Bonner's injury.  A misfire or jam is a foreseeable occurrence if the shotgun's barrel becomes loose due a failure of a weld holding the barrel in place.  A failure of a weld, braze joint or soldered stud joint should not occur if a shotgun is properly manufactured or designed.  As he was holding the subject Norinco shotgun with the barrel pointed upward, Brian Bonner suddenly felt the barrel begin to slide and, instinctively, he moved his right hand to the top of the barrel to keep the barrel from falling off.  There would have been no such reaction but for the failure of a weld, braze joint or soldered stud joint.  Unfortunately, Brian Bonner inadvertently allowed his left hand to come in contact with the trigger.  Again, there would have been no such inadvertent contact with the trigger but for the failure of a weld, braze joint or soldered stud joint.

Brian Bonner's cause-in-fact theory is not predicated on speculation and is not inconsistent with the factual record viewed in the light most favorable to him.  Norinco

concentrates on when the barrel completely fell off and ignores that the critical event was when the barrel became loose and started to slide off. By his instinctive reaction, Brian Bonner delayed when the barrel did fall off. Unfortunately, his natural instinctive reaction resulted in his right hand grasping the top of the barrel when the shotgun accidentally discharged. Again, there would have been no accidentally discharge but for the defect manufacture or design of the subject Norinco shotgun.

In summation, Brian Bonner proffered a causation theory that is consistent with his description of the accident and with tendered expert opinion testimony. Norinco is not entitled to a summary judgment based on its second asserted ground.


## Conclusion

Norinco failed to demonstrate that Brian Bonner was contributorily negligent as a matter of law; alternatively, Brian Bonner proffered ample substantial evidence to create a genuine question of fact as to whether he was contributorily negligent at all. Brian Bonner met Norinco's challenge to proffer sufficient evidence, including expert opinion evidence, to support his contention that the defective or unreasonably dangerous Norinco shotgun was a proximate cause of his injuries to his right hand. The subject Norinco shotgun was defectively manufactured or designed so as to allow the barrel to come loose from the magazine tube. Brian Bonner's instinctive reactions to sensing the barrel starting to slide off were both foreseeable and reasonable. But to the defectively manufactured or designed weld, brazing joint or soldered stud, this accident would never have occurred. Norinco is not entitled to a summary judgment based on either of its two asserted grounds.

Respectfully submitted,

**s/ David J. Hodge**
*Of Counsel for Plaintiff*
Bar Number: ASB -4617-I71H
Pittman Dutton Kirby & Hellums, P.C.
2001 Park Place North
1100 Park Place Tower
Birmingham, Alabama 35203
(205) 322-8880
(205) 328-2711 facsimile
Email: PHDKH-efiling@pittmanhooks.com

## CERTIFICATE OF SERVICE

I hereby certify that on **6**[th] day of **March**, **2008**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Todd M. Higey, Esq.
RICHARDSON CLEMENT, P.C.
200 Cahaba Park Circle, Suite 125
Birmingham, AL 35242
***Attorney for Interstate Arms and Qiqihar Hawk***

James C. Barton, Jr., Esq.
Alan D. Mathis, Esq.
JOHNSTON, BARTON, PROCTOR & POWELL, LLP
2900 Regions/Harbert Plaza
1901 6th Avenue North
Birmingham, AL 35203
***Attorney for Norinco***

**s/ David J. Hodge**
Of Counsel for Plaintiff